55 P.3d 632 (2002)
STATE of Washington, Respondent,
v.
Mark Logan SCHELIN, Petitioner.
No. 70710-3.
Supreme Court of Washington, En Banc.
Argued September 25, 2001.
Decided October 17, 2002.
*633 Douglas Phelps, Spokane, for Petitioner.
Steven Tucker, Spokane County Prosecutor, Kevin Korsmo, Deputy, Andrew Metts, Deputy, Spokane, for Respondent.
IRELAND, J.
This court granted review of a Court of Appeals' decision affirming application of a deadly weapon sentencing enhancement pursuant to former RCW 9.94A.310 (2000). The defendant was convicted of manufacturing marijuana and manufacturing marijuana with intent to deliver. Finding the defendant was in close proximity to a deadly weapon that he could have easily and readily used for offensive or defensive purposes in connection with *634 his marijuana grow operation, we affirm the Court of Appeals.

FACTS
Background
On August 21, 1996, a search warrant was executed at the home of Mark Logan Schelin (Schelin) shared with his girl friend, Mutsako Lundquist. The police knocked at Schelin's door, and Lundquist permitted them to enter and search their two-bedroom home, which contained a partial basement. When police entered the home, Schelin was in the basement at the bottom of the stairs. Police ordered Schelin to walk up the stairs, and he was then handcuffed.
When officers searched the basement, they found a loaded revolver stored in a holster, hanging from a nail on a wall, approximately 6 to 10 feet away from where Schelin had been standing.
The basement contained two rooms and a laundry room. In one of the rooms, police discovered 70 rooted marijuana plants and 50 starter plants.[1] In another room, which Schelin identified as his bedroom, large amounts of harvested marijuana, dried marijuana leaves, scales, packaging materials, weapons, a militia handbook, $50,000 in gold coins, and cash were found.
Schelin was read his constitutional rights, but chose to waive those rights. He admitted to living in the home, growing marijuana, and owning the gold coins, cash, and firearms.
Procedural History
Schelin was arraigned and charged with possession of a controlled substance with intent to manufacture (marijuana). The charges were subsequently amended to charge him with possession of a controlled substance with intent to manufacture (marijuana) while armed with a deadly weapon (firearm) and possession of a controlled substance with intent to deliver (marijuana) while armed with a deadly weapon (firearm).
The trial court granted Schelin's pretrial motion to suppress the militia handbook and all weapons except the gun holstered on the wall in the basement near the bedroom and grow operation.
Schelin's defense was that the marijuana was for his own personal use in treating Delayed Stress Syndrome (DSS). Schelin testified he experienced guilt from not having faced actual combat during an army tour of duty in Vietnam. Schelin claimed his DSS caused him to regularly experience ringing in his ears that was relieved by marijuana use. Schelin testified the ringing in his ears prevented him from fully understanding his constitutional rights and led to his waiving those rights.
With regard to the loaded revolver, Schelin testified that his girl friend was frightened of her ex-husband. Schelin explained that the gun was used to protect his home from invasion by Lundquist's estranged spouse and that he kept the gun near his bedroom in the event the home was broken into at night.
Schelin was convicted on April 9, 1998 of one count of possession of a controlled substance with intent to manufacture and one count of possession of a controlled substance with intent to deliver. By special verdict, the jury also found Schelin "armed" with a deadly weapon as to both counts pursuant to former RCW 9.94A.125 (1983). Schelin was sentenced to 45 months of confinement, including 18 months for the weapon enhancements.
The Court of Appeals affirmed Schelin's conviction, the deadly weapon enhancement, and the sentence. State v. Schelin, 104 Wash.App. 48, 14 P.3d 893 (2000).

ISSUE
The sole issue is whether Schelin was "armed" during the commission of his crimes for purposes of the deadly weapon sentencing enhancement authorized by former RCW 9.94A.310(3).

ANALYSIS
Standard of Review
"Whether a person is armed is a mixed question of law and fact." State v. *635 Mills, 80 Wash.App. 231, 234-35, 907 P.2d 316 (1995). In the case before us, Schelin does not dispute that a deadly weapon was hanging near where he had been standing. Thus, we determine whether the facts are sufficient, as a matter of law, to prove that Schelin was armed. This is a question of law to be reviewed de novo. Id.
Enhancement Statute
Former RCW 9.94A.125 authorizes finding a special verdict as to whether a defendant is "armed" with a deadly weapon at the time of the commission of the crime. In relevant part, the statute provides:
In a criminal case wherein there has been a special allegation and evidence establishing that the accused ... was armed with a deadly weapon at the time of the commission of the crime, ... the jury shall, if it find[s] the defendant guilty, also find a special verdict as to whether or not the defendant ... was armed with a deadly weapon at the time of the commission of the crime.
Former RCW 9.94A.125.
Further, the statute also defines a deadly weapon as follows:
For purposes of this section, a deadly weapon is an implement or instrument which has the capacity to inflict death and from the manner in which it is used, is likely to produce or may easily and readily produce death. The following instruments are included in the term deadly weapon:... pistol, revolver, or any other firearm
. . . .
Id. (emphasis added).
Jury Instructions
The jury was informed by instruction 21 that "[a] pistol, revolver, or any other firearm is a deadly weapon whether loaded or unloaded" and that "[a] person is armed with a deadly weapon if, at the time of the commission of the crime, the weapon is easily accessible and readily available for offensive or defensive use." Clerk's Papers (CP) at 176. Instruction 22 further informed the jury that a deadly weapon is "an instrument which has the capacity to inflict [death] and from the manner in which it is used is likely to produce or may easily or readily produce death." CP at 177.[2]
Defining "Armed"
Schelin contends that the trial court should have dismissed the deadly weapon allegation against him because the State did not meet its burden of proving he was "armed" during the commission of manufacturing and possessing with intent to deliver marijuana. The test for determining when a defendant is "armed" under former RCW 9.94A.125 was articulated by this court in State v. Valdobinos, 122 Wash.2d 270, 282, 858 P.2d 199 (1993). In Valdobinos, police discovered an unloaded .22 rifle under the defendant's bed while executing a warrant to search for evidence of illegal drug sales. Drugs and money were also found under the bed. The Valdobinos court held that "[a] person is `armed' if a weapon is easily accessible and readily available for use, either for offensive or defensive purposes." Id.
Applying this test, the Valdobinos court ruled that evidence of an unloaded rifle under a bed "without more" was insufficient to show a defendant is "`armed' in the sense of having a weapon accessible and readily available for offensive or defensive purposes." Id. The Valdobinos court clearly established that mere constructive possession is insufficient to prove a defendant is "`armed' with a deadly weapon during the commission of a crime" as required by former RCW 9.94A.125. Id.
*636 Nexus of Weapon to Defendant and Crime
In addition to the test announced in Valdobinos, subsequent cases have refined the nexus required in a constructive possession case. Under a two-part analysis, there must be a nexus between the weapon and the defendant and between the weapon and the crime.
In formulating its test, the Valdobinos court relied on State v. Sabala, 44 Wash.App. 444, 723 P.2d 5 (1986). In Sabala, a drug possession case, the court concluded that a defendant in constructive possession of a deadly weapon under the driver's seat of the car he or she is driving is armed because the defendant has an "easily accessible and readily available weapon" at his or her disposal. Id. at 448, 723 P.2d 5.
Mills furthers the analysis by assuring that parameters are placed on the determination of when a defendant is armed, especially in the instance of a continuing crime such as constructive possession. State v. Mills, 80 Wash.App. 231, 235-37, 907 P.2d 316 (1995). In Mills, the defendant was arrested near his home, and while in custody, the officers found a motel key Mills had attempted to hide between the patrol car seat cushions. After obtaining a warrant for the motel room, a search yielded methamphetamine and a pistol in a pouch lying beside the narcotics. The court found no evidence that the defendant had been present at the motel room on the date stated in the charging document. Id. at 237, 907 P.2d 316.
The Mills court considered two constructive possession cases, State v. Call, 75 Wash. App. 866, 880 P.2d 571 (1994), and State v. Taylor, 74 Wash.App. 111, 872 P.2d 53 (1994).
In Call, police recovered three handguns while executing a search warrant for evidence of narcotics sales. The defendant's proximity to the drugs recovered was not set forth in the facts of that case, but the defendant entered the bedroom where the guns were found and returned "unarmed." "Based on these facts, the Call court concluded that the evidence was insufficient to prove that the defendant had easy access to the guns." Mills, 80 Wash.App. at 236, 907 P.2d 316 (citing Call, 75 Wash.App. at 869, 880 P.2d 571).
The Mills court noted by contrast that in Taylor, the defendant was "armed" within the meaning of former RCW 9.94A.125. In that case, police entered defendant Taylor's apartment to conduct a search warrant. A weapon and ammunition were found in a leather bag, next to narcotics, near where the defendant was sitting. Mills, 80 Wash.App. at 236, 907 P.2d 316. The Taylor court considered proximity as key to determining whether the defendant was "armed" with a deadly weapon.
After reviewing these cases, the Mills court concluded that although there was an inference that Mills used a deadly weapon to protect his drugs, there was no nexus established between the defendant and the weapon on the charging date. The court reasoned that "[h]ere, where Mills would have needed to travel several miles to retrieve his weapon, we cannot say that he was `armed' for purposes of the enhancement statute." Id. at 237, 907 P.2d 316.
In State v. Johnson, 94 Wash.App. 882, 893, 974 P.2d 855 (1999), the court focused not only on the nexus between the defendant and the weapon, but also articulated the need for a nexus between the weapon and the crime. In Johnson, police executed a search warrant in defendant Matthew Johnson's apartment. When police entered the apartment, Johnson was seen running from the living room toward the bathroom before another person was observed throwing objects out of the bedroom window. Police pulled Johnson away from the hallway between the living room and bathroom, put him down on the floor, and advised him of his constitutional rights. While handcuffed, Johnson waived his rights and responded to police questioning, revealing that he maintained a loaded gun in a coffee table compartment some five to six feet away from where he was then sitting.
At trial, Johnson testified he was in bed, half-asleep in the bedroom, when he heard police knocking and announcing their eventual entry. Thus, Johnson argued he could not have been "armed" with a deadly weapon at *637 the time police discovered his drug possession crimes.
The Johnson court required the State to prove proximity to the weapon and to show that a sufficient nexus between the weapon, the crime, and the defendant existed to establish that the defendant was "armed" for purposes of former RCW 9.94A.125. The Court of Appeals reasoned: "Simply constructively possessing a weapon on the premises sometime during the entire period of illegal activity is not enough to establish a nexus between the crime and the weapon." Johnson, 94 Wash.App. at 895, 974 P.2d 855.
We agree that the mere presence of a weapon at a crime scene may be insufficient to establish the nexus between a crime and a weapon. If an assault with a beer bottle occurs in a kitchen, a defendant is not necessarily "armed" with a deadly weapon because knives are kept in the kitchen. One should examine the nature of the crime, the type of weapon, and the circumstances under which the weapon is found (e.g., whether in the open, in a locked or unlocked container, in a closet on a shelf, or in a drawer).
Temporal Nexus Test
This court was also asked to review seemingly inconsistent applications of nexus tests by the Court of Appeals concerning the deadly weapon sentence enhancement. The case of State v. Simonson, 91 Wash.App. 874, 960 P.2d 955 (1998), review denied, 137 Wash.2d 1016, 978 P.2d 1098 (1999), was criticized in Johnson, and in the Court of Appeals' decision in Schelin, as inconsistent with precedent.
In Simonson, police responded to the scene of an exploded methamphetamine laboratory maintained in a green trailer. The defendant, Simonson, had lived on the same property in a nearby silver trailer with his girl friend, Susan Robinson. However, on the day of the explosion, Simonson was in jail on unrelated charges. The first person to arrive at the scene saw Robinson emerge from the silver trailer, badly burned. A few minutes later, emergency personnel found a loaded handgun in the mud outside the green trailer.
According to the police, the weapon had just been dropped because it did not have dew or rust on it. Based on this information, police obtained a search warrant for the silver trailer near where the methamphetamine laboratory was located. That search yielded a number of firearms found in the bedroom, in a cabinet above the bed, behind a table at the opposite end of the bed, and also behind the bedroom television on another table. The search also uncovered 10,000 pseudoephedrine pills in the bedroom.
Simonson was convicted of unlawfully manufacturing a controlled substance, in addition to six counts of firstdegree unlawful possession of a firearm. The defendant was also found, by special verdict, to have been "armed" with a deadly weapon at the time of the unlawful manufacture. Division Two of the Court of Appeals found as follows:
Taken in the light most favorable to the State, the evidence here shows that Simonson and Robinson were committing a continuing offense, manufacturing methamphetamine, over a six-week period of time. During some or all of that time, they kept seven guns on the premises. It is reasonable to infer that not less than four were kept in a loaded condition, for it is obvious that Robinson did not load them after being burned in the explosion. It is also reasonable to infer that the purpose of so many loaded guns was to defend the manufacturing site in case it was attacked. We conclude that the evidence is sufficient to support the deadly weapon enhancement.
Simonson, 91 Wash.App. at 883, 960 P.2d 955.
The Johnson court criticized Division Two's analysis in Simonson, stating: "Simonson abandons the proximity rationale for one that allows the court to find a defendant `armed' with a deadly weapon where a weapon is present on the premises during a crime that continues over a period of time." Johnson, 94 Wash.App. at 895, 974 P.2d 855. The critique continues:
The Simonson court concluded that the mere presence of loaded guns on Simonson's premises during the six-week period he was manufacturing methamphetamines was sufficient to find he was armed at the *638 time of his offense. The court reached this conclusion even though the defendant was in jail at the time police discovered the meth lab and therefore was nowhere near the seven weapons they found in his trailer.
Id.
This bitter critique of Simonson recited in Johnson was shared by the Court of Appeals in Schelin. However, the critique comes from a superficial analysis of Simonson which fails to account for the accomplice liability which was present in Simonson. Although Simonson was in jail, his accomplice, Robinson, continued the operation as evidenced by her being in the explosion of the green trailer where the methamphetamine laboratory was housed. Robinson maintained and protected the operation with deadly weapons constructively possessed by Simonson. The Simonson court found that the evidence showed both Simonson and Robinson were committing a continuing offense.
From Simonson, it is clear that a jury is entitled to find that a defendant and accomplice can commit a single continuing offense even though one is not physically close to the operation. The jury was entitled to find that Simonson committed the offense of manufacturing methamphetamine by himself, or by aiding and abetting Robinson's continuing manufacture of the drug while he was imprisoned.
In either event, Robinson was an accomplice. The deadly weapon enhancement statute specifically provides, "if [a jury finds] the defendant guilty, [the jury shall] also find a special verdict as to whether or not the defendant or an accomplice was armed with a deadly weapon at the time of the commission of the crime." Former RCW 9.94A.125 (emphasis added).
Importantly, the Simonson court did not abandon establishing a nexus between the crime, weapon, and defendant or accomplice. The Simonson court only clarified that the defendant or an accomplice must be in proximity to a deadly weapon at the time a crime is committed. This conclusion is consistent with Valdobinos and Mills. A deadly weapon must be accessible and readily available, and a nexus must be established between the defendant (or an accomplice), and the weapon, and the crime.
The Court of Appeals in Schelin was concerned about whether the critical time for analysis should be determined by the time when the offense is committed or when police discover a crime has been committed. This discussion is misdirected, as there is no reason to believe the Legislature intended the statute to solely protect police. It is equally likely that the statute is intended to deter armed crime and to protect victims from armed crimes, as well as to protect police during investigations of crimes.

APPLICATION
Sufficiency of the Evidence
When analyzing a sufficiency of the evidence claim, the court will draw all inferences from the evidence in favor of the State and most strongly against the defendant. State v. Joy, 121 Wash.2d 333, 339, 851 P.2d 654 (1993). The evidence presented at trial in the instant case established that the defendant was within feet of a deadly weapon when police entered his home. Further, Schelin testified that the deadly weapon was easily accessible and readily available. Specifically, Schelin testified:
[Defense counsel]: Why did you have that gun in the bedroom?
[Schelin]: That gun defends my family from my girlfriend's ex-husband.
III Report of Proceedings (RP) at 393.
[Prosecutor]: ... It's hanging from the holster in that bedroom, right?
[Schelin]: Yes ... It's hanging from the nail on the wall at the side of the door ... It's not on the door; it's in a corner.
[Prosecutor]: It's very close to the door, isn't that right?
[Schelin]: Yes.
[Prosecutor]: Is it safe to say then, if that boyfriend came over in 1996, that gun was very accessible to you to protect your family?
*639 [Schelin]: If I needed it I could go get it....
III RP at 402-03.
More specifically, Schelin clarified:
[Prosecutor]: So you indeed could remove that gun quickly from the holster if you needed it?
[Schelin]: Yes.
[Prosecutor]: While it's hanging on the wall?
[Schelin]: Yes.
III RP at 405-06.
Given the direct evidence concerning Schelin's location at the time police officers entered his home, the jury was entitled to find him constructively "armed." Furthermore, the jury was entitled to find, pursuant to the jury instructions, that the weapon was "easily accessible and readily available for use, either for offensive or defensive purposes at that time." Clerk's Papers (CP) at 176.
The evidence established that Schelin had constructive possession of an easily accessible and readily available deadly weapon when police discovered him in his home. See Sabala, 44 Wash.App. at 447, 723 P.2d 5. Whether Schelin was "armed" for purposes of former RCW 9.94A.125, however, requires the court to establish that a nexus existed between him, the weapon, and the crime.
The use of the Mills nexus test enables this court to determine whether Schelin was constructively "armed" with a deadly weapon within former RCW 9.94A.125. Mills, 80 Wash.App. at 233, 907 P.2d 316. Under Mills, a nexus which connects the defendant in proximity with the weapon and the crime is required to find a deadly weapon enhancement. Id. at 236 n. 1, 907 P.2d 316.
Turning to the facts here, the evidence established Schelin was in close proximity to a loaded gun which he constructively possessed to protect his marijuana grow operation. When we apply the nexus test, as expressed in Johnson, the inferences support a conclusion that Schelin was "armed." Schelin admitted to being in close proximity to an "easily accessible and readily available" deadly weapon. The jury was entitled to infer he was using the weapon to protect his basement marijuana grow operation. Schelin stood near the weapon when police entered his home and could very well have exercised his apparent ability to protect the grow operation with a deadly weapon, to the detriment of the police.
Schelin argues that application of this analysis is overreaching and violates his constitutional right to bear arms. While Schelin's right to bear firearms in his home is constitutionally protected, that right ceases when the purpose of bearing firearms is to further the commission of a crime. See Sabala, 44 Wash.App. at 449, 723 P.2d 5. Requiring a nexus between the defendant, the crime, and the weapon protects against violation of the right to bear arms.
The jury was entitled to find Schelin was armed pursuant to former RCW 9.94A.125. Given the jury's finding, the deadly weapon sentence enhancement applied against Schelin's convictions for manufacturing marijuana with the intent to deliver was mandatory.
Public Policy Concerns
The State urges this court to further consider the broad implications of a temporal requirement with regard to former RCW 9.94A.125. The State contends that including a temporal requirement for application of former RCW 9.94A.125 will result in less protection for the general public and will exclude the use of the deadly weapon sentence enhancement in cases involving continuing crimes. This argument, however, is not persuasive. The requirement of a nexus to connect a defendant to a deadly weapon, and the weapon to the crime, guards against a deadly weapon enhancement being found whenever constructive possession is established. With no such temporal nexus requirement, the exercise of the constitutional right to bear arms could be negatively impacted.

SUMMARY
Former RCW 9.94A.310(3) authorizes the court to add sentencing enhancements when a defendant is "armed" with a deadly weapon during the commission of certain crimes. A defendant is "armed" when he or she is *640 within proximity of an easily and readily available deadly weapon for offensive or defensive purposes and when a nexus is established between the defendant, the weapon, and the crime. The Court of Appeals' decision is affirmed.
SMITH, BRIDGE and OWENS, JJ., concur.
ALEXANDER, C.J. (concurring).
The only issue before us is whether the record contains sufficient evidence to support the jury's finding that Mark Logan Schelin was "armed" with a deadly weapon during the commission of the crimes of manufacturing marijuana and manufacturing marijuana with intent to deliver. "The test for determining the sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found guilt beyond a reasonable doubt." State v. Salinas, 119 Wash.2d 192, 201, 829 P.2d 1068 (1992) (citing State v. Green, 94 Wash.2d 216, 220-22, 616 P.2d 628 (1980)).
Because this was a jury trial and Schelin is not assailing the trial court's jury instruction regarding when a person is "armed" with a deadly weapon, we look to see if the State met the evidentiary burden placed on it in the jury instructions. Here the jury was told in jury instruction 22 that "[a] person is armed with a deadly weapon if, at the time of the commission of the crime, the weapon is easily accessible and readily available for offensive or defensive use." Clerk's Papers at 177. Consequently, that is what the State had to prove in order for the deadly weapon enhancement to attach. Viewing the evidence most favorably to the State, it is readily apparent that the State produced sufficient evidence that Schelin was "armed," as that term is defined in the jury instruction that is unchallenged on appeal. I, therefore, concur with the majority's decision that the Court of Appeals should be affirmed.
I write separately simply because, in my view, the State should have been required to show more than what the trial court's jury instruction required it to show. In that regard, I agree with the dissent that the State should have to affirmatively prove beyond a reasonable doubt that there is a nexus between the defendant, the crime, and the deadly weapon. Dissent at 10. The problem for Schelin is that he has not claimed here or at the Court of Appeals that the trial court's instruction is deficient or that the jury should have received additional instructions regarding when a defendant is armed. He simply says that the evidence the State produced was insufficient to support the jury's finding that he was armed. Because the jury's verdict was based on the aforementioned instruction, he is incorrect.
Finally, a brief word about the dissent's dissertation about what it claims is the majority's undermining of the guaranty of the right to keep and bear arms as set forth in article I, section 24 of the state constitution. The dissent devotes many pages to this issue despite the fact that Schelin has made no such argument. Indeed, in his petition for review and supplemental brief Schelin does not even mention that provision of our state's constitution. A review of the brief he presented to the Court of Appeals is similarly devoid of any reference to the aforementioned article I, section 24. In light of the failure of Schelin to assert that his constitutional right to bear arms has been violated, there should be no discussion of the issue.
I concur with the majority and would affirm the Court of Appeals.
SANDERS, J. (dissenting).
The majority's disposition defeats the plain language of the deadly weapon enhancement statute, former RCW 9.94A.125 (1983), and undermines the guaranty of the right to keep and bear arms as set forth in article I, section 24, of the Washington Constitution. Under our state constitution the right to keep and bear arms is the rule, whereas the State's ability to burden that right is the narrowly confined exception. Although the constitutional right to bear arms is not unlimited in scope, within its scope that right is absolute.
To justify a statutory deadly weapon sentence enhancement based on a defendant's alleged use of a firearm, the State must make the threshold showing that the defendant *641 was actually "armed" with a firearm during the commission of the crime charged. Merely showing the defendant constructively possessed it is insufficient as a matter of law. Here, the evidence offered by the State at Mark Schelin's trial fails to establish he was armed with the gun found hanging on the wall of his bedroom during the commission of the crimes for which he was charged. Regrettably, the majority excuses the failure and takes yet another stumbling step down the slippery slope toward the ultimate destruction of our civil right to keep and bear arms. I must dissent.

I.

SCHELIN'S CONSTRUCTIVE POSSESSION OF A FIREARM IS INSUFFICIENT AS A MATTER OF LAW TO PROVE HE WAS "ARMED"
Investigating an anonymous tip, an officer with the Spokane Police Department approached Schelin's children playing outside his home and requested their father to come outside. When Schelin came out, unarmed, the officer engaged him in a conversation, which led the officer to suspect Schelin might be engaged in criminal, drug-related activities. The officer later applied for and was issued a search warrant, which was executed a few days later by the Spokane Police Department's Special Investigative Unit. Entering Schelin's home, police first encountered his live-in girl friend at the front door. They then progressed further into the house, at which point they found Schelin standing, still unarmed, at the foot of the stairs to the basement. An officer ordered Schelin upstairs. Still unarmed, he complied. Schelin was then arrested and handcuffed.
Only subsequent to Schelin's arrest did police search his home, including the basement area. The basement was made up of a laundry room and two bedrooms, one room to the north, and another to the southeast. The search revealed rooted and starter marijuana plants, dried marijuana leaves, scales, militia materials, money, and a weapons collection. In the southeast bedroom, separate from the marijuana grow operation, police also found two firearms hanging from the door, one of which was loaded. The record is unclear on the precise distance between Schelin, where he was standing at the bottom of the stairs, and the loaded gun, but the distance seems to have been at least 10 to 15 feet.
At trial Schelin testified the gun was intended to defend his family from his girl friend's ex-husband. Verbatim Report of Proceedings (Apr. 7 & 8, 1998) at 393, 403-05. The State presented no evidence to the contrary. There was no evidence Schelin ever used the gun, let alone used it to defend or promote his marijuana grow operation. The jury found Schelin guilty of possession of a controlled substance with intent to manufacture and possession with intent to deliver. Notwithstanding the complete lack of evidence Schelin ever used the gun in furtherance of a crime, the jury also returned a special verdict finding Schelin was "armed" contrary to former RCW 9.94A.125. Schelin now challenges the weapon enhancement verdict for want of substantial evidence.
The statutory issue is whether Schelin was "armed with a deadly weapon" pursuant to the deadly weapon enhancement statute, former RCW 9.94A.125, when he committed his ongoing crime of possession of a controlled substance. To properly resolve this issue we must construe this statute on its face and in light of the constitutional right to keep and bear arms (article I, section 24 of our state constitution) so as to critically evaluate whether the State has proved beyond a reasonable doubt Schelin was in fact "armed" while he committed the crimes for which he was charged.
The deadly weapon enhancement statute provides in part:
[T]he court shall make a finding of fact of whether or not the accused or an accomplice was armed with a deadly weapon at the time of the commission of the crime, or if a jury trial is had, the jury shall, if it find[s] the defendant guilty, also find a special verdict as to whether or not the defendant or an accomplice was armed with a deadly weapon at the time of the commission of the crime.
Former RCW 9.94A.125 (1983). This statute is part of the Sentencing Reform Act of 1981(SRA), although it was not added to the SRA until 1983. See Laws of 1983, ch. 163, *642 § 3. As originally enacted, the deadly weapon statute subjected only a limited number of felonies to a sentence enhancement, none of which were possessory crimes.[1] However, the statute was radically revised in 1995 when voters approved Initiative 159 (I-159). This initiative made the deadly weapon enhancement applicable to nearly every felony defined by Washington law, and also lengthened the mandatory sentence enhancements. Laws of 1995, ch. 129.
The leading Supreme Court authority on what it means to be "armed" under the deadly weapon enhancement statute is State v. Valdobinos, 122 Wash.2d 270, 858 P.2d 199 (1993). There, as the majority concedes, we held mere constructive possession of a firearm is insufficient to establish a defendant was armed for purposes of former RCW 9.94A.125. Id. at 282, 858 P.2d 199; majority at 635.[2] Until today this holding has been good law and the fundamental underpinning of a proper application of former RCW 9.94A.125. We further elaborated our holding in Valdobinos by explaining a person is "armed" so as to justify applying the deadly weapon enhancement only if the State has shown "a weapon [was] easily accessible and readily available for use, either for offensive or defensive purposes." Valdobinos, 122 Wash.2d at 282, 858 P.2d 199. The State must make this showing beyond a reasonable doubt to sustain a deadly weapon enhancement. State v. Tongate, 93 Wash.2d 751, 754, 613 P.2d 121 (1980).
Our decision in Valdobinos was heavily influenced by the Court of Appeals opinion in State v. Sabala, 44 Wash.App. 444, 723 P.2d 5 (1986). In Sabala the defendant was stopped in his car after having made a controlled buy from the Yakima police department. Id. at 445, 723 P.2d 5. A consent search of his car revealed a handgun under the driver's seat. Id. There was no dispute the gun belonged to the defendant, and that it was within easy and actual reach when he sat in the driver's seat. See id. at 448, 723 P.2d 5. The defendant was convicted of possession of a controlled substance with intent to deliver, and his sentence was enhanced based on his possession of the firearm. Id. at 446-47, 723 P.2d 5. Sabala challenged his conviction arguing he was merely in constructive possession of the gun, which was insufficient to prove he was "armed" with it. Id. at 447, 723 P.2d 5. The Court of Appeals upheld the sentence, concluding the presence of the gun under the driver's seat constituted sufficient evidence "the gun was easily accessible and readily available for use by the defendant for either offensive or defensive purposes." Id. at 448, 723 P.2d 5. The same could be said of the armed robber.
Although we accepted the Sabala court's reasoning in Valdobinos, we concluded the evidence presented in Valdobinos was insufficient to support a finding the defendants were "armed" pursuant to former RCW 9.94A.125. Valdobinos, 122 Wash.2d at 282, 858 P.2d 199. In Valdobinos, law enforcement officers executing a search warrant of defendants' home discovered a .22 rifle under a bed. Id. at 273-74, 282, 858 P.2d 199. We affirmed defendants' convictions for the underlying drug-related crimes, but struck the firearm enhancement portions of their sentences, stating:
On this record, evidence that an unloaded rifle was found under the bed in the bedroom, without more, is insufficient to qualify Valdobinos as "armed" in the sense of having a weapon accessible and readily available for offensive or defensive purposes.

*643 The trial court therefore erred in relying on the provision of RCW 9.94A.125 permitting a sentence to be enhanced if a defendant is "armed" with a deadly weapon.
Id. at 282, 858 P.2d 199 (emphasis added).
The Court of Appeals further addressed when a person is "armed" in State v. Call, 75 Wash.App. 866, 880 P.2d 571 (1994). There the court held the State must show more than potential to use a firearm to justify a deadly weapon sentence enhancement. Id. at 868-69, 880 P.2d 571. In Call Spokane police officers went to the defendant's home to arrest him on outstanding warrants. Id. at 867, 880 P.2d 571. Before the defendant left with the officers, he went to his bedroom to pick up some identification. Id. Although the defendant kept three handguns in his bedroom, which the defendant had every potential to use at the officers' peril, he returned from the bedroom unarmed. Id. When the officers returned to the defendant's home at later point in time to execute a search warrant they found cocaine, LSD, marijuana, and a marijuana grow operation. Id. at 868, 880 P.2d 571.[3] They also discovered the three handguns, one of which was loaded, in the defendant's bedroom. Id. The defendant was convicted of three counts of possession of a controlled substance, and the trial court enhanced his sentence 12 months pursuant to former RCW 9.94A.125 based on its finding the defendant "`was in constructive possession of the three (3) handguns.'" Id. at 867-68, 880 P.2d 571. The defendant appealed this sentence enhancement, arguing his constructive possession of the guns was insufficient basis to find he was armed. Id. at 868, 880 P.2d 571. The Court of Appeals agreed, applying the Valdobinos standard:
Here, the trial court's findings relating to the guns in Mr. Call's bedroom establish constructive possession of the weapons, but fail to address the essential question, namely whether any of the weapons was easily accessible and readily available. The findings are insufficient to support imposition of an enhanced sentence under RCW 9.94A.310(3)(c), and the sentence must be stricken.
The only evidence relating to availability of the guns was the police officer's testimony he "found two in a dresser drawer within the bedroom against the south wall of the bedroom, and one in a tool box at the footfoot of the bed ...". Mr. Call had gone to the bedroom and returned unarmed. This is not sufficient evidence to support a finding the guns were easily accessible and readily available.
Call, 75 Wash.App. at 869, 880 P.2d 571.
The rejection of constructive possession as sufficient basis for a deadly weapons enhancement took one further step in State v. Mills, 80 Wash.App. 231, 907 P.2d 316 (1995). There, the court held a defendant was not "armed with a deadly weapon at the time of the commission of the crime" pursuant to former RCW 9.94A.125 even when in contemporaneous constructive possession of both a weapon and illegal drugs. In Mills a sheriff deputy discovered methamphetamine in Mills's car, arrested Mills, and placed him in custody in the back of the patrol car. Mills, 80 Wash.App. at 233, 907 P.2d 316. After the defendant began moving "furtively" in the back seat of the patrol car, the deputy removed defendant and searched between the seat cushions. Id. The search revealed a motel key, based on which the deputy obtained a search warrant for the motel room. Id. Upon executing the warrant, the deputy discovered a gun pouch beside a large quantity of methamphetamine. Id. The defendant was convicted for possession of a controlled substance and received a 12-month sentence enhancement based on his constructive possession of the firearm. Id. at 232, 907 P.2d 316. The Court of Appeals affirmed the conviction for possession, but reversed the sentence enhancement. Id. at 232, 907 P.2d 316.
The court rejected the State's argument the defendant was "armed" based on exclusive possession and control over the contents of the motel room, which included the gun. Id. at 234-35, 907 P.2d 316. The court also *644 rejected the trial court's approach, which looked only for a connection between the underlying crime, possession of methamphetamine, and the gun. Id. at 236, 907 P.2d 316. According to Mills, the potential to use the gun to protect drugs is insufficient. Id. Instead the court held the State was required to show "a nexus between the defendant and the weapon." Id.
Mills's nexus approach was further developed in State v. Johnson, in which the court explained "a person is not armed simply because a weapon is present during the commission of a crime." 94 Wash.App. 882, 892, 974 P.2d 855 (1999). The court reasoned:
Simply constructively possessing a weapon on the premises sometime during the entire period of illegal activity is not enough to establish a nexus between the crime and the weapon. Without that nexus, we run the risk of convicting a defendant under the deadly weapon enhancement for having a weapon unrelated to the crime. The theory behind the deadly weapon enhancement is that a crime is potentially more dangerous to the victim, bystanders or the police if the defendant is armed while he is committing the crime because someone may be killed or injured. Thus, the crime is more serious than it would have been without the weapon. Where no officers, victims or bystanders are present, the potential danger is also absent, and the rationale for greater punishment based on greater danger to others does not apply. The underlying rationale can apply only where there is a possibility the defendant would use the weapon.
Id. at 895-96, 974 P.2d 855 (footnotes omitted). I agree an essential element of proof must demonstrate a nexus between the defendant, the crime, and the weapon. So says our majority as well. Majority at 639.
In sum, this line of precedent establishes the following: First, constructive possession of a firearm is insufficient to support a deadly weapons sentence enhancement. Valdobinos, 122 Wash.2d at 282, 858 P.2d 199. Second, a defendant's potential to use a firearm in connection with a criminal enterprise is also not enough to apply former RCW 9.94A.125. Call, 75 Wash.App. at 868-69, 880 P.2d 571. Cf. State v. Williams, 85 Wash. App. 508, 514, 933 P.2d 1072 (1997) (holding proof that defendant actually handled loaded gun during drug transaction established accessibility of the gun under Valdobinos), rev'd on other grounds, 135 Wash.2d 365, 957 P.2d 216 (1998). Third, merely establishing a firearm was present on premises where an ongoing crime was committed is insufficient as a matter of law to justify enhancing a sentence for the substantive crime. Johnson, 94 Wash.App. at 892, 974 P.2d 855. And finally, the State must affirmatively prove beyond a reasonable doubt a nexus between the defendant, the crime, and the weapon. See Mills, 80 Wash.App. at 236, 907 P.2d 316.
Although the majority purports to rely on Valdobinos and its progeny, the evidence presented at Schelin's trial shows, at most: (1) Schelin was in constructive possession of the gun hanging on the wall in his bedroom; (2) Schelin had the potential to use the gun at the officers' peril during their execution of the search warrant by closing the gap of 15 or so feet from the bottom of the stairs to where the gun was hanging in the bedroom; and (3) the firearm in question was discovered on the same premises on which Schelin's criminal enterprise took place. However, under the principles discussed above, this is insufficient as a matter of law to support Schelin's deadly weapon enhancement because no nexus was proved. The majority's decision to nevertheless uphold Schelin's sentence constitutes a radical departure from the Valdobinos line of cases, while at the same time giving them lip service. Moreover, if former RCW 9.94A.125 means what the majority claims it does, this statute violates the right to bear arms guaranteed by article I, section 24, of the Washington Constitution. It is our duty to avoid such a statutory construction if at all possible. Anderson v. Morris, 87 Wash.2d 706, 716, 558 P.2d 155 (1976).

II.

THE RIGHT TO KEEP AND BEAR ARMS IS ABSOLUTE WITHIN THE SCOPE OF ARTICLE I, SECTION 24
Appropriate constitutional analysis begins with the text and, for most purposes, *645 should end there as well.[[4]]
The right to keep and bear arms has long been recognized by the common law as essential to enable individuals to resist tyranny and defend themselves. 2 WILLIAM BLACKSTONE, COMMENTARIES *139. Discussing the rights of persons, Blackstone noted the right to keep and bear arms is "a natural right of resistance and self-preservation when the sanctions of society and law are found insufficient to restrain the violence of oppression." Id. Likewise, the English Bill of Rights declares that subjects of the Crown "may have arms for their defense suitable to their conditions and as allowed by law." THE ENGLISH BILL OF RIGHTS 1689 in 6 The STATUTES OF THE REALM (1225-1713) at 142-45 (1810) (orig. prtg. in Gr. Brit. by King George III) (facsim. located in Historical Collection at Gallagher Law Library, Univ. of Wash. Sch. of Law).
In modern days, the right is among those guaranteed in numerous state declarations of rights, although the nature and scope of that right varies from state to state.[5] Unfortunately, the right has effectively been relegated to second-class constitutional status in the eyes of some errant jurists who seemingly prefer to impose their own social and political views, considering the right to keep and bear arms not deserving of the same protection as, say, the freedom of speech or the right against self-incrimination. See generally David B. Kopel et al., A Tale of Three Cities: The Right to Bear Arms in State Supreme Courts, 68 TEMP. L.REV. 1177 (1995) (critically analyzing three state constitutional decisions and concluding they were based on the courts' disfavor of the right to bear arms and view of that right as one not entitled to the same judicial protection as other constitutional rights).
Notwithstanding, the right to keep and bear arms as guaranteed by the Washington Constitution is express, mandatory, and absolute within its scope:
The right of the individual citizen to bear arms in defense of himself, or the state, shall not be impaired, but nothing in this section shall be construed as authorizing individuals or corporations to organize, maintain or employ an armed body of men.
Const. art. I, § 24 (emphasis added). Without doubt, this provision confers upon our fellow citizens the individual right to keep and bear arms.[6] Although we have noted the right secured in our state constitution may be broader than that provided by the second amendment to the United States Constitution, we have yet to determine the outer limits of this provision. See City of Seattle v. Montana, 129 Wash.2d 583, 594, 919 P.2d *646 1218 (1996); State v. Rupe, 101 Wash.2d 664, 706, 683 P.2d 571 (1984). Cf. Md. Const. Declaration of Rights art. 28; 79 Op. Maryland Att'y Gen. (Feb. 25, 1994). Yet there is no doubt each citizen enjoys equal privilege to the right guaranteed by this provision. Const. art. I, § 12; see W.J. Meyers, The Privileges and Immunities of Citizens in the Several States, 1 MICH L.REV. 286, 290-94 (1903).
Equally clear is that the scope of this individual right is qualified by textual exceptions. First, the right exists only in the context of an individual's "defense of himself, or the state." Const. art. I, § 24. Second, the right does not authorize "individuals or corporations to organize, maintain or employ an armed body of men." Id. Not only do these textual qualifications limit the scope of the right to bear arms, but they also prove the general rule by enumerating an explicit list of exceptionsexpressio unius est exclusio alteriusthe inclusion of one is the exclusion of the other. State v. Brown, 139 Wash.2d 20, 33, 983 P.2d 608 (1999); State v. Sommerville, 111 Wash.2d 524, 535, 760 P.2d 932 (1988).
Accordingly, the inclusion of the two textual limitations in article I, section 24, demonstrates there is no basis to infer any other exception, certainly not one based on the State's so-called police power. This is a crucial, yet often overlooked, distinction between article I, section 24 and corresponding provisions in many other constitutions. Cf., e.g., Ill. Const. art. I, § 22 ("Subject only to the police power, the right of the individual citizen to keep and bear arms shall not be infringed."); Ga. Const. art. I, § 1, para. VIII ("The right of the people to keep and bear arms shall not be infringed, but the General Assembly shall have the power to prescribe the manner in which arms may be borne."); Tex. Const. art. I, § 23 ("Every citizen shall have the right to keep and bear arms in the lawful defense of himself or the State; but the Legislature shall have power, by law, to regulate the wearing of arms, with a view to prevent crime."); Utah Const. art. I, § 6 ("The individual right of the people to keep and bear arms for security and defense of self, family, others, property, or the state, as well as for other lawful purposes shall not be infringed; but nothing herein shall prevent the legislature from defining the lawful use of arms.").
In Washington it is the police power which is subject to all of the rights specified in our Declaration of Rights, including the constitutional right of the individual citizen to keep and bear arms. Notwithstanding, courts in the relatively recent past have suggested precisely the opposite by positing without meaningful analysis this civil liberty is subject to "reasonable regulation" by the state under its so-called police power. See, e.g., Rupe, 101 Wash.2d at 707 n. 9, 683 P.2d 571; State v. Spencer, 75 Wash.App. 118, 122, 876 P.2d 939 (1994); Sabala, 44 Wash.App. at 449, 723 P.2d 5 (citing Rupe); Johnson, 94 Wash.App. at 892, 974 P.2d 855 (same); Taylor, 74 Wash.App. at 124, 872 P.2d 53 (same). The origin of this heresy seems to be the 1945 decision in State v. Krantz, 24 Wash.2d 350, 353, 164 P.2d 453 (1945). See also Rupe, 101 Wash.2d at 707 n. 9, 683 P.2d 571.
Krantz upheld the uniform short firearms act against a challenge under article I, section 24, opining that statute was a reasonable exercise of the State's "police power." Krantz asserted "[i]t has long been recognized that this constitutional guarantee is subject to reasonable regulation by the state under its police power." Krantz, 24 Wash.2d at 353, 164 P.2d 453 (citing United States v. Miller, 307 U.S. 174, 59 S.Ct. 816, 83 L.Ed. 1206 (1939); English v. State, 35 Tex. 473, 1872 WL 7422 (1872); Pierce v. State, 42 Okla.Crim. 272, 275 P. 393 (1929); People v. Persce, 204 N.Y. 397, 97 N.E. 877 (1912); Hill v. State, 53 Ga. 472, 1874 WL 3112 (1874); Page v. State, 50 Tenn. (3 Heisk.) 198 (1871)). It is now time to critically reevaluate that overly broad assertion. Notably, each of the cases relied on by Krantz was based on constitutional provisions far different from article I, section 24, in terms of the interplay between the right to keep and bear arms and the State's police power.
Miller, English, and Persce all involved challenges under the Second Amendment to the United States Constitution. See Miller, 307 U.S. at 176, 59 S.Ct. 816; English, 35 Tex. 473, 1872 WL 7422 at *2; Persce, 97 *647 N.E. at 879. In contrast to article I, section 24, of the Washington Constitution, which guarantees Washington citizens an individual right to keep and bear arms, the Second Amendment is often claimed to grant only a collective right, as its text suggests:
A well regulated militia being necessary to the security of a free state, the right of the people to keep and bear arms, shall not be infringed.
U.S. Const. amend. II. See Hickman v. Block, 81 F.3d 98, 102 (9th Cir.1996). See also supra at p. 645 n. 6. Moreover, the Second Amendment was "originally a limitation only upon the power of Congress and the National government, and not upon that of the States." Presser v. Illinois, 116 U.S. 252, 265, 6 S.Ct. 580, 584, 29 L.Ed. 615 (1886).
Pierce involved a challenge to an Oklahoma statute prohibiting the carrying of firearms under article II, section 26, of the Oklahoma Constitution. Pierce, 275 P. at 394. Unlike article I, section 24, of the Washington Constitution, the constitutional provision at issue in Pierce expressly provides for regulation of firearms by the legislature:
The right of a citizen to keep and bear arms in defense of his home, person, or property, or in aid of the civil power, when thereunto legally summoned, shall never be prohibited; but nothing herein contained shall prevent the Legislature from regulating the carrying of weapons.
Okla. Const. art. II, § 26. Similarly, Page involved a challenge under article I, section 26, of the Tennessee Constitution, which also expressly allows the legislature to regulate how firearms may be borne:
That the citizens of this State have a right to keep and to bear arms for their common defense; but the Legislature shall have power, by law, to regulate the wearing of arms with a view to prevent crime.
Tenn. Const. art. I, § 26.[7]
Lastly, Hill was based on article I, section 14, of the Georgia Constitution of 1868, which spoke in language very similar to that of the Second Amendment:
"A well regulated militia being necessary to the security of a free state, the right of the people to keep and bear arms shall not be infringed; but the general assembly shall have power to prescribe by law the manner in which arms may be borne."
Hill, 53 Ga. 472, 1874 WL 3112, at *2. The Georgia provision not only expressly subjects the right to bear arms to the legislature's regulatory powers; it also seems to provide for a collective rather than individual right to keep and bear arms, unlike article I, section 24, of our constitution.
Our constitutional guaranty of the individual right to keep and bear arms contains no textual qualification subjugating that right to police power regulations. See supra at pp. 646-647. And we must be ever mindful that we are not at liberty to disregard this text as "[t]he provisions of this Constitution are mandatory, unless by express words they are declared to be otherwise." Wash. Const. art. I, § 29. Moreover, as previously stated, the mandatory provision in article I, section 24 is strengthened, not defeated, by the two textual exceptions to the otherwise absolute right to keep and bear arms, which by implication permit no other unmentioned restrictions on, or exceptions to, the otherwise absolute right to keep and bear arms. Robert F. Utter, Freedom and Diversity in a Federal System: Perspectives on State Constitutions and the Washington Declaration of Rights, 7 U. Puget Sound L.Rev. 491, 509-10 (1983) ("the express mention of one thing in a constitution implies the exclusion of things not mentioned").
Article I, section 24, obviously is not subservient to the State's police power by its text. Krantz fails to honor that text, wherefore it is erroneous, harmful, and destructive to our civil liberties. Moreover, Krantz is inconsistent with the very structure of liberty secured by our Declaration of Rights by its *648 claim that any of our declared civil liberties are ever "subject to" the police power.

III.
OUR DECLARATION OF RIGHTS ENUMERATES EXCEPTIONS TO OTHERWISE LEGITIMATE GOVERNMENT ACTIONS, INCLUDING POLICE POWER ACTIONS
A proper resolution of this case also requires an accurate understanding of the constitutional nature of our state government and the structural role of our Declaration of Rights with respect thereto. As originally expressed by Alexander Hamilton when advocating adoption of the federal constitution absent a national Bill of Rights, a declaration of rights serves only one function: to delineate exceptions to otherwise legitimate exercises of governmental powers. THE FEDERALIST No. 84, at 437 (Alexander Hamilton) (Bantam Books 1982).
I go further, and affirm that bills of rights, in the sense and in the extent in which they are contended for, are not only unnecessary in the proposed constitution, but would even be dangerous. They would contain various exceptions to powers which are not granted: and on this very account, would afford a colourable pretext to claim more than were granted. For why declare that things shall not be done which there is no power to do? Why for instance, should it be said, that the liberty of the press shall not be restrained, when no power is given by which restrictions may be imposed?
Id. (emphasis added). Clearly, in the view of the founders, the very purpose of a declaration of rights is to except from the reach of government any power to abridge the rights secured thereby. If the rights guaranteed by a declaration of rights are not exceptions to governmental power, including the police power, those rights are illusory because the government has no power to exceed its legitimate functions in any event. By its nature and placement then, article I, section 24, as any other civil liberty enumerated in our Declaration of Rights, is meaningful only to the extent it sets forth an exception to an otherwise legitimate exercise of power by our state government. Open Door Baptist Church v. Clark County, 140 Wash.2d 143, 178-79 & n. 3, 995 P.2d 33 (2000) (Sanders, J., dissenting).
The origin and development of former RCW 9.94A.125 shows this statute, if properly construed, is indeed not only a legitimate exercise of the State's police power but outside the article I, section 24, exception thereto. The deadly weapon enhancement statute was enacted and repeatedly amended out of a desire to protect the public from those who would use firearms not in defense of themselves or the State, but to violate the rights of others. The stated purpose expressed in I-159 clearly evidences this intent. It was enacted to:
(a) Stigmatize the carrying and use of any deadly weapon for all felonies with proper deadly weapon enhancements.
(b) Reduce the number of armed offenders by making the carrying and use of the deadly weapon not worth the sentence received upon conviction.
(c) Distinguish between the gun predators and criminals carrying other deadly weapons and provide greatly increased penalties for gun predators and for those offenders committing crimes to acquire firearms.
Laws of 1995, ch. 129, § 1(2). See also RCW 9.94A.010(4). Cf. Markham Advert. Co. v. State, 73 Wash.2d 405, 421-22, 439 P.2d 248 (1968) (noting the State may exercise its police power to "`prescribe laws tending to promote the health, peace, morals, education, good order and welfare of the people'" (quoting Shea v. Olson, 185 Wash. 143, 153, 53 P.2d 615 (1936))). Properly construed former RCW 9.94A.125 is consistent with Schelin's right to keep and bear arms as defined by article I, section 24, because that civil liberty is limited to defensive uses and does not protect the commission of armed crime.
But here the State attempts to apply the statute against mere possession of a firearm. Even the State conceded at oral argument that it was simply unable to reconcile its proposed application of the statute to the text of article I, section 24. Audio tape 1 of 1: Wash. State Supreme Court oral argument, State v. Schelin, No. 70710-3 (Sept. 25, 2001) (on file with clerk's office) (conceding, *649 in response to a question from the bench on how to reconcile the State's position with the plain language of the constitution, that the State does not "have a reconciliation at this point"). That should end the matter.

IV.

CRIMINAL CULPABILITY CANNOT BE INFERRED FROM THE EXERCISE OF CONSTITUTIONALLY PROTECTED BEHAVIOR
To constitutionally construe and apply this statute the State must prove a nexus between the defendant, the crime, and the firearm by not only proving beyond a reasonable doubt the defendant was in actual or constructive possession thereof, Mills, 80 Wash. App. at 236, 907 P.2d 316, but also that the defendant[8] actually used that firearm to aid the commission of the crime charged. The State must prove both elements to satisfy former RCW 9.94A.125 in a manner consistent with the Washington Constitution.
The actual or intended use of a firearm during the commission of a crime is constitutionally necessary because by its plain language article I, section 24, protects the possession or use of firearms with the intent to defend oneself or the State. To overcome this constitutional shield the State must show the defendant used or intended to use the firearm during the commission of the charged crime. Cf. Call, 75 Wash.App. at 869, 880 P.2d 571 (suggesting potential to use a gun for offensive purposes is insufficient grounds for sentence enhancement under former RCW 9.94A.125). Here, however, the State utterly failed to show Schelin's mere constructive possession of the gun in his bedroom facilitated the commission of possessory crimes, much less was intended to do so. The majority asserts, without citation to the record, "the evidence established Schelin was in close proximity to a loaded gun which he constructively possessed to protect his marijuana grow operation." Majority at 639 (emphasis added). The evidence establishes no such thing. At most, it establishes (i) Schelin was merely in constructive possession of the gun; and (ii) the gun was in Schelin's home for defense of Schelin and his family. See supra at p. 641.
Constitutionally protected behavior cannot form the basis for criminal punishment, nor can it be used to infer the basis for criminal punishment. Rupe, 101 Wash.2d at 704, 683 P.2d 571 (citing Hess v. Indiana, 414 U.S. 105, 107, 94 S.Ct. 326, 38 L.Ed.2d 303 (1973); Stanley v. Georgia, 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969)). Rupe held (1) "[t]he State can take no action which will unnecessarily `chill' or penalize the assertion of a constitutional right"; and (2) "the State may not draw adverse inferences from the exercise of a constitutional right." Rupe, 101 Wash.2d at 705, 683 P.2d 571 (citing United States v. Jackson, 390 U.S. 570, 88 S.Ct. 1209, 20 L.Ed.2d 138 (1968)). While the right to keep and bear arms does not include the right to engage in criminal activity, cf. State v. Russell, 25 Wash.App. 933, 939, 611 P.2d 1320 (1980), the simple fact remains that the State has failed to show Schelin ever used the gun to engage in criminal activity. Instead of presenting the jury with proof of that fact it asked the jury, and now us, to infer, based on the presence of the gun on the same premises as Schelin's marijuana grow operation, that the gun was used in connection with that criminal enterprise. Although the State's requested inference is impermissible under Rupe, the majority accepts it and infers criminal culpability based solely on Schelin's exercise of his constitutional right to keep and bear arms. To credit such an inference allows Schelin's constitutionally protected behavior to form a basis for his criminal punishment, in violation of the guaranty in article I, section 24. Cf. Rupe, 101 Wash.2d at 706-08, 683 P.2d 571 (striking down a death sentence based in part on the admission into evidence of robbery defendant's gun collection because there was no established relation between the gun and the crime).
We cannot, as suggested by the Court of Appeals in State v. Simonson, infer from *650 simple presence of firearms at the scene of a crime that those arms were used for criminally offensive purposes. 91 Wash.App. 874, 883, 960 P.2d 955 (1998). Remarkably, even though the Simonson court offered no support for its shortcut,[9] the majority accepts its reasoning and holds:
The jury was entitled to infer [Schelin] was using the weapon to protect his basement marijuana grow operation. Schelin stood near the weapon when police entered his home and could very well have exercised his apparent ability to protect the grow operation with a deadly weapon, to the detriment of the police.
Majority at 639.
The Simonson shortcut must be rejected because it allows the State to sentence a person for criminal activity in which he or she could have engaged but did not. Similarly, the inference to which the majority refers is impermissible because it applies to situations in which the possession or use of firearms falls within the gambit of article I, section 24.

V.

SCHELIN'S CLAIM IS NOT PROCEDURALLY BARRED
The concurring opinion contends we should not engage in a discussion of how former RCW 9.94A.125 may be applied in harmony with article I, section 24, because Schelin does not rely on that constitutional provision. Concurrence at 2-3. However, Schelin does in fact reference the state constitution to support his argument that proof of a nexus between gun possession and criminal conduct was essential to save the statute from constitutional challenge. See, e.g., Br. of Appellant at 18 ("It is not illegal in and of itself to own or possess firearms, in fact, it is a constitutionally protected right...."). Schelin has consistently challenged his deadly weapon enhancement based on his constitutional right to keep and bear arms, and excepted to the court's instructions on exactly that basis. In fact, both counsel addressed the constitutionality of former RCW 9.94A.125 at oral argument.
With respect to the deadly weapon enhancement, the trial court instructed the jury:
Instruction No. 21
For purposes of a special verdict the State must prove beyond a reasonable doubt that the defendant was armed with a deadly weapon at the time of the commission of the crime in Count(s) I [possession of a controlled substance with intent to manufacture] and II [possession of a controlled substance with intent to deliver].
A pistol, revolver, or any other firearm is a deadly weapon whether loaded or unloaded.
Instruction No. 22
A person is armed with a deadly weapon if, at the time of the commission of the crime, the weapon is easily accessible and readily available for offensive or defensive use.
Clerk's Papers at 176-77.
At trial Schelin excepted to instruction 22, arguing it was overly broad because it permitted the jury to find a violation of former RCW 9.94A.125 based on mere exercise of the constitutional right to keep a gun in one's home for self-defense. He argued:
Any time there is an [sic] grow operation in a home the State could argue that if there is a weapon in that home, then that gun is readily accessible and available for offensive or defensive use.
Verbatim Report of Proceedings at 430.
Schelin's argument remains the same on appeal. He challenges his sentence enhancement by arguing the State failed to prove beyond a reasonable doubt he was "armed" pursuant to former RCW 9.94A.125. Br. of Appellant at 14-19; Pet. for Review at 5-9. Specifically, according to Schelin, the State failed to carry its burden to prove the necessary *651 nexus. Br. of Appellant at 19. As previously mentioned, this nexus requirement is not only statutory but is a constitutional imperative stemming from the restrictions placed on the government by article I, section 24. See, e.g., Johnson, 94 Wash.App. at 892, 895-96, 974 P.2d 855.
The concurring opinion's assertion "Schelin is not assailing the trial court's jury instructions regarding when a person is `armed' with a deadly weapon" is contrary to the facts in the recordas is its assertion this instruction "is unchallenged on appeal." Concurrence at 640-641. Admittedly, Schelin did not specifically assign error to the instruction on appeal, choosing instead to rest his fate on the more fundamental claim that the State simply failed to prove the nexus element beyond a reasonable doubt. "Assailing" the instruction which inaccurately defined when a person is "armed" for purposes of a deadly weapon enhancement is part and parcel of Schelin's argument that insufficient evidence was introduced to prove the nexus element.
The concurrence seems to conclude we are precluded from reviewing the sufficiency of evidence to prove the actual elements of the offense absent specific assignment of error to an erroneous instruction. To that extent, it fails to account for our decision in State v. Green, 94 Wash.2d 216, 616 P.2d 628 (1980), where we incorporated the United States Supreme Court's test for reviewing verdicts for sufficient evidence:
[T]he critical inquiry on review of the sufficiency of evidence to support criminal conviction must be not simply to determine whether the jury was properly instructed, but to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt.
Jackson v. Virginia, 443 U.S. 307, 318, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (emphasis added); see Green, 94 Wash.2d at 221, 616 P.2d 628. Sufficiency of the evidence is not measured against a false standard established by an erroneous jury instruction. It is measured by the proof to substantiate the true elements of the offense charged. Jackson, 443 U.S. at 318, 99 S.Ct. 2781.[10]
Nevertheless, the concurrence baldly claims failure to assign error to an erroneous (but excepted-to) instruction defeats review of a verdict premised on legally insufficient evidence. The assertion flies in the face of the fact that reversal would necessarily have resulted from failure of proof had the jury in Schelin's trial been properly instructed on the element of a nexus since, even when the jury is properly instructed, review for evidence sufficiency proceeds unaltered as a matter of law. See, e.g., Schatz v. Heimbigner, 82 Wash. 589, 144 P. 901 (1914), cited with approval in State v. Hickman, 135 Wash.2d 97, 102, 954 P.2d 900 (1998).
I find it startling that the Chief Justice would deny this prisoner relief absent any citation to authority to support avoidance of an admittedly meritorious constitutional claim. Is it not passing strange that by the logic of the concurrence Schelin could obtain a reversal of the deadly weapon enhancement if the jury had been properly instructed, but must spend years in the penitentiary because it was erroneously instructed?
The right to reverse a conviction for insufficient evidence is of a constitutional magnitude. Sufficient evidence is "evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense." Jackson, 443 U.S. at 316, 99 S.Ct. 2781. The presence of such is secured by the due process clause of the Fourteenth Amendment to the United States Constitution.
[In re] Winship [, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970)] presupposes as an essential of the due process guaranteed by the Fourteenth Amendment that *652 no person shall be made to suffer the onus of a criminal conviction except upon sufficient proofdefined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense.
Id.
Here, an essential element of proof to sustain the enhanced verdict was proof of a nexus between Schelin, the crime, and the weapon. See supra at p. 644. Since the concurring opinion agrees this nexus is a required element of proof, its conclusion that this deadly weapon enhancement may be affirmed notwithstanding insufficient evidence is a non sequitur.
This deadly weapon enhancement must be reversed. I dissent.
JOHNSON, J. (concurring in the dissent)
I agree with Justice Sanders' dissent to the extent that it concludes the evidence in this case was insufficient under Valdobinos[1] and its progeny to support the application of a deadly weapon enhancement. I write separately because the State also failed to prove that Mark Schelin was armed with a "deadly weapon" under the statute authorizing the special verdict.[2] The statute provides in relevant part: "a deadly weapon is an implement or instrument which has the capacity to inflict death and from the manner in which it is used, is likely to produce or may easily and readily produce death." Former RCW 9.94A.125 (1983) (emphasis added).[3]
The State presented no evidence that Schelin used the revolver seized from his home in any manner likely to produce death. On the contrary, because the revolver was seized after Schelin's arrest, some 10 or 15 feet away from Schelin, the State's only argument was that Schelin could have accessed it had he chosen to resist his arrest. However, the uncontroverted testimony of the detectives at Schelin's trial was that Schelin did not resist his arrest, did not attempt to reach his gun, and did not unholster his gun. Report of Proceedings (RP) at 123, 137, 181. The officers could not even say whether Schelin appeared at the foot of the basement stairs from the same room in which the gun was stored. RP at 209.
The question whether Schelin could have armed himself with the seized firearm is irrelevant. The statute requires evidence establishing that the weapon was used in a manner likely to produce or easily and readily producing death. Even when viewed in the light most favorable to the State, the evidence presented at Schelin's trial was insufficient to prove that the manner in which he used the seized firearm classified it as a deadly weapon under former RCW 9.94A.125.
MADSEN, J., concurs.
CHAMBERS, J. (concurring in dissent).
I concur with Justice Sanders that article I, section 24 of the Washington Constitution guarantees the right to keep and bear arms. Simple constructive possession of a weapon on the premises sometime during the entire period of illegal activity is not enough to establish a nexus between the crime and the weapon. Without that nexus, we run the risk of convicting a defendant under the deadly weapon enhancement for having a weapon unrelated to the crime. See Judge Agid's excellent analysis in State v. Johnson, 94 Wash.App. 882, 892-97, 974 P.2d 855 (1999).
NOTES
[1] Detective Marvin Hill testified that one marijuana plant has a street value of up to $2,000.
[2] Although the state must prove that the defendant is "armed" with a deadly weapon, a firearm is considered a deadly weapon whether loaded or unloaded. See 11 WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 2.07.02, at 37 (2d ed.1994) (stating "For purposes of a special verdict the State must prove beyond a reasonable doubt that the defendant was armed with a deadly weapon at the time of the commission of the crime ... [a] pistol, revolver or any other firearm is a deadly weapon whether loaded or unloaded."); see also State v. Sullivan, 47 Wash.App. 81, 85, 733 P.2d 598 (1987) (holding unloaded firearm was a deadly weapon per se); State v. Samaniego, 76 Wash.App. 76, 79, 882 P.2d 195 (1994) (holding a knife with a four inch blade was a deadly weapon per se).
[1] Initially, only rape in the first degree, robbery in the first degree, kidnapping in the first or second degree, burglary in the first or second degree, assault in the second degree, and escape in the first degree, were subject to the deadly weapon enhancement. Laws of 1983, ch. 115, § 2. In 1988, theft of livestock in the first or second degree was added, followed by assault of a child in the second degree in 1992. Laws of 1988, ch. 218, § 1; Laws of 1992, ch. 145, § 9. In addition, the statute was amended in 1986 to apply to anticipatory offenses and all drug offenses. Laws of 1986, ch. 257, § 22.
[2] In contrast, constructive possession may be sufficient to support a conviction for unlawful possession of a firearm. See State v. Staley, 123 Wash.2d 794, 798-99, 872 P.2d 502 (1994). It follows that the State, to show a defendant was "armed" pursuant to former RCW 9.94A.125, must show more than merely establishing the defendant unlawfully possessed a firearm at some point during the commission of a crime.
[3] It is unclear from the opinion whether the defendant was home during the officers' search of the house pursuant to the search warrant.
[4] Malyon v. Pierce County, 131 Wash.2d 779, 799, 935 P.2d 1272 (1997).
[5] See, e.g., Ala. Const. art I, 26; Alaska Const. art. I, § 19; Ariz. Const. art. II, § 26; Ark. Const. art. II, § 5; Colo. Const. art. II, § 13; Conn. Const. art. I, § 15; Fla. Const. art. I, § 8(a); Ga. Const. art. I, § 1, para. VIII; Haw. Const. art. I, § 17; Idaho Const. art. I, § 11; Ill. Const. art. I, § 22; Ind. Const. art. I, § 32; Kan. Const. Bill of Rights § 4; Ky. Const. § 1; La. Const. art. I, § 11; Me. Const. art. I, § 16; Mass. Const. pt. I, art. 17; Mich. Const. art. I, § 1.I(6); Miss. Const. art. III, § 12; Mo. Const. art. I, § 23; Mont. Const. art. II, § 12; Neb. Const. art. I, § 1; N.M. Const. art. II, § 6; N.Y. Civ. Rights Law, art. II, § 4; N.C. Const. art. I, § 30; Ohio Const. art. I, § 4; Okla. Const. art. II, § 26; Or. Const. art. I, § 27; Pa. Const. art. I, § 21; R.I. Const. art. I, § 22; S.D. Const. art. VI, § 24; Tenn. Const. art. I, § 26; Tex. Const. art. I, § 23; Utah Const. art. I, § 6; Vt. Const. ch. I, art. 16; Wash. Const. art. I, § 24; W. Va. Const. art. III, § 22; Wyo. Const. art. I, § 24.
[6] As opposed to a collective right granted to the people as an aggregate. Other states have recognized near identical provisions in their respective constitutions confer upon their citizens an individual right to bear arms. See, e.g., Dano v. Collins, 166 Ariz. 322, 802 P.2d 1021, 1024 (Ct. App.1990); Kalodimos v. Vill. of Morton Grove, 103 Ill.2d 483, 83 Ill.Dec. 308, 470 N.E.2d 266, 273 (1984); Schubert v. DeBard, 398 N.E.2d 1339, 1341 (Ind.Ct.App.1980); People v. Brown, 253 Mich. 537, 235 N.W. 245, 246 (1931). In contrast, provisions referring to the people as a whole are generally construed as conferring only a collective right to bear arms. See, e.g., City of Salina v. Blaksley, 72 Kan. 230, 83 P. 619, 620 (1905) (construing a provision guaranteeing "`that the people have the right to bear arms for their defense and security'" as granting the right to bear arms to the people as a collective body); Commonwealth v. Davis, 369 Mass. 886, 343 N.E.2d 847, 848-49 (1976) (construing a provision guaranteeing that "`[t]he people have a right to keep and to bear arms for the common defence'" as granting the right to bear arms to "the aggregate of citizens").
[7] Although Page does not expressly cite article I, section 26, of the Tennessee Constitution, it is apparent from the State's reference to the phrase "common defense" that the case was decided under the Tennessee Constitution as opposed to the Second Amendment since only the Tennessee provision contains that phrase. Compare Tenn. Const. art. I, section 26, with U.S. Const. amend. II.
[8] Or, in the alternative, an accomplice. See former RCW 9.94A.125 (authorizing a sentence enhancement when "there has been a special allegation and evidence establishing that the accused or an accomplice was armed with a deadly weapon at the time of the commission of the crime" (emphasis added)).
[9] The majority excused this aberration relying on an accomplice-liability analysis, suggesting Simonson's girl friend could have used the gun while he was in jail. Majority at 637. However, this reasoning also avoids mandate of the Washington Constitution which requires the State to show any usewhether by the defendant or his or her accomplicewas outside the scope of article I, section 24.
[10] The only potential exception to this rule is when an instruction was not subject to objection or exception, as it then may become the law of the case. See, e.g., State v. Hickman, 135 Wash.2d 97, 102, 954 P.2d 900 (1998) (citing cases); cf. Tonkovich v. Dep't of Labor & Indus., 31 Wash.2d 220, 225, 195 P.2d 638 (1948) (noting sufficiency of the evidence is measured against unchallenged instructions unless "the record or evidence conclusively shows that the party in whose favor the verdict is rendered is not entitled to recover"). But law of the case doctrine is no bar here since Schelin in fact imposed an appropriate and spirited exception to instruction 22.
[1] State v. Valdobinos, 122 Wash.2d 270, 858 P.2d 199 (1993).
[2] Justice Ireland is entirely correct that 11 WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 2.07.02 (2d ed. 1994) (WPIC) defines a firearm as a per se deadly weapon for sentence enhancement. However, WPIC 2.07.02 does not take into account our earlier line of cases holding enhanced punishment requires proof beyond a reasonable doubt that the deadly weapon is operable. See State v. Pam, 98 Wash.2d 748, 659 P.2d 454 (1983), overruled on other grounds by State v. Brown, 113 Wash.2d 520, 782 P.2d 1013 (1989); and State v. Mathe, 35 Wash.App. 572, 668 P.2d 599 (1983), aff'd, 102 Wash.2d 537, 688 P.2d 859 (1984). These cases were decided under former RCW 9.95.040, but the guiding principles they relied upon have not been rejected by this court.
[3] Recodified as RCW 9.94A.602 by Laws 2001, ch. 10, § 6.